IN THE
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

LEE MAYES,
            Plaintiff,

v.                                                    Case No. 1:16-cv-01288-JEH

COMMISSIONER OF SOCIAL
SECURITY,
            Defendant.

## Order and Opinion

Now before the Court is the Plaintiff Lee Mayes's Motion for Summary Judgment (Doc. 14), the Commissioner's Motion for Summary Affirmance (Doc. 18), and the Plaintiff's Response to the Commissioner's Motion for Summary Affirmance (Doc. 21).[1]  For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Defendant's Motion for Summary Affirmance.[2]

## I

On August 31, 2012, Mayes filed an application for Supplemental Security Income (SSI) alleging disability beginning on April 25, 2005.  His claim was denied initially on December 5, 2012 and was denied upon reconsideration on March 7, 2013. On March 12, 2013, Mayes filed a request for hearing concerning his application for SSI.  A hearing was held before the Honorable Shreese M. Wilson (ALJ) on February 5, 2014.  A second hearing, on June 23, 2014, was prompted by the postponement of the February 5th hearing due to Mayes's inability to continue with that first hearing

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9 & 10).
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 6) on the docket.

halfway through it.  At both hearings Mayes was represented by counsel and at the June 23rd hearing a Vocational Expert (VE) testified.  Following the hearing, Mayes's claim was denied on July 18, 2014.  His request for review by the Appeals Council was denied on October 21, 2015, making the ALJ's Decision the final decision of the Commissioner.  Mayes filed the instant civil action seeking review of the ALJ's Decision on August 1, 2016.[3]

## II

At the time he applied for benefits, Mayes was 44 years old living in Peoria, Illinois with his girlfriend Barbara Polk and his friend Junior Smith.  On his From SSA-3368, Mayes listed all the physical conditions that limited his ability work as follows:  Glaucoma, diabetes, high blood pressure, high cholesterol, and back problems.  AR 351.

At the first hearing on February 5, 2014, Mayes testified that he lived in a one story home that required him to climb four steps into it.  He drove about once every two to three weeks.  He had taken two trips to Mississippi since he filed his SSI application in August 2012 – once to see his mother and the second to attend her funeral – and he became sick on the bus down there and threw up and eventually was taken to the hospital in Mississippi to stay overnight.  His last job was as a grocery store stock clerk in April 2005.  He testified that he stopped working after he felt something pop in his back while unloading a truck and learned that he had a "disc out."  AR 109.  Mayes also testified that he did not look for other work after that because he was going back and forth to the doctor and because he could not get around because of his back.

Mayes testified that he had a cane for a year and half and it was given to him by Dr. Robinson at the "Mercy Room."  AR 110.  He explained that, "[T]he therapy people came down with a cane and a walker and they asked me which one I want to

---

[3] On July 1, 2016, in response to a request by Mayes, the Appeals Council granted an extension of time to file an appeal.

turn [sic]. I said I'll try both of them see [sic] which one is the best for me to use and he said, well, just use the cane so we used the cane." AR 110. Mayes stated that the reason he was given the cane was because his left leg was really weak and he was falling a lot, and he had been using it ever since he received it. He testified that he used it outside and inside the house. He explained that his left leg felt weak for about three years and that he fell "every other six months" when the pain hit him really hard so that his left leg buckled and he fell down. AR 111. He described his back pain as stabbing in his lower back and that sitting down for "a good while" made it worse, and he would then have to get up and move around because otherwise his whole back became numb and pain started shooting up his left shoulder. *Id.* at 111-12.

He testified that his feet felt like they were burning all the time and that was why he had taken his shoes off during the hearing. Mayes also described how his feet stayed cold a lot and that his doctor thought his high sugars were what caused the sensations in his feet. He stated that his blurry vision was also caused by his high blood sugar and his high blood pressure. He testified to headaches every three weeks that lasted for about an hour. Mayes testified that during any given day he sat at home in his recliner for about an hour to two hours and would have to get up to move around with his cane due to his whole back and everything stiffening up on him. He would have to be up and moving for at least half an hour. He said he otherwise only went to the bathroom during the day and when his back pain began to hurt, he would get up to take pain pills and if they did not work, his girlfriend would put a Fentanyl patch on him. He mentioned that Fentanyl patches, Norco, and the other medications he took made him sleepy and as a result, he was asleep at home a lot.

Mayes also testified that he could not bend over to tie his shoes and when asked how he would get his shoes on, he demonstrated how he would have to sit on a chair and put his feet up. At that point during the hearing, the ALJ went off record briefly and when the hearing resumed, the ALJ explained that during his demonstration,

Mayes experienced a lot of pain and he was unable to get his pain under control. Mayes and his attorney agreed they would like to postpone the hearing which was done until June 23, 2014.

At the resumed June 23, 2014 hearing, Mayes testified the he was using his cane to walk around as he started falling a lot and his leg gave out on him easily. Mayes said the cane was prescribed in March of 2013, and he had it for three years. He testified that his Fentanyl patches were increased to 100 milligrams since the last hearing, and he was wearing one for left shoulder pain during that very hearing. He also testified that he was using his medication, as he needed it for pain and was not taking more than he was supposed to take. He stated that the doctors did not think he was taking more pain medication than he should be taking. He did drink alcohol on occasion for holidays "or stuff like that" and used marijuana every two to three days if needed for pain. AR 63-64. He elaborated that he used marijuana that frequently if needed for pain and if he did not have his Fentanyl patch; he would smoke a joint, lay down and sleep or get his girlfriend or his uncle to rub his back down with Icy Hot to release the muscle pain in his back. Mayes testified that his treating physician, Dr. Greg Stoner, M.D., prescribed him something for muscle spasms that he had all over his back and his shoulders, and Mayes also stated that he could not raise his left shoulder over his head.

Mayes testified again to discs out in his back, pain on his whole left side, his current use of a Fentanyl patch, and the drowsiness caused by his medication. When questioned by his attorney about the best position for him to take at home, Mayes explained that he put a pillow toward his back while in his recliner so he could sit back. He said he could sit there for 10 minutes and then his muscles and "everything starts jumping in my back and I have to get up and use my cane and walk around." AR 65. He also said that if moving around did not help, then he would get in the shower and let it hit the spot where his back hurt. He was sometimes in the shower for five hours daily. He said that when he was really hurting, his girlfriend would

call an ambulance to take Mayes to the emergency room. As for whether he could do anything else to help relieve the pain, Mayes stated that he went to physical therapy, but the exercises they told him to try made him hurt more. His girlfriend would rub cream on his back daily without relief, and she would eventually become tired of his crying and hurting so that she would call an ambulance. Mayes testified that he would receive shots in the emergency room, and Dr. Stoner would give him shots as well. He testified to his inability to go out of the house to do anything and that when he squatted down, he needed help to get up because of the pain.

Mayes further stated that if he tried to walk down the street a block he would have to stop and rest. He said he sometimes tried to walk to the store early in the morning and then back to his house, though he would have to sit down for a minute before he returned to the house. He stated that he could sit comfortably for 45 minutes and then his back would start to become tight, and he would have to get up and move and walk around. Mayes also stated he could stand for about an hour until he felt his left leg getting weaker and then he would have to sit before he fell.

Mayes explained that he could not perform a job because of his pain and inability to lift anything over 10 pounds. When questioned from where that limitation came, Mayes explained that it was given while he was staying in Mississippi and going to Memphis in anticipation of back surgery. It was at that time that he learned he had diabetes and high blood pressure. He stated that the maximum he could lift was a bag of chips.

Mayes's girlfriend then testified. She testified that she tried to reduce Mayes's pain by massaging his back about three times per week and that Mayes basically spent his days in the tub or just laying down. She stated that the only time Mayes had relief was when he wore a Fentanyl patch and otherwise she took him to the emergency room.

The ALJ then proceeded to question the VE, Ronald Malik. The ALJ first questioned the VE based upon a 46 year old hypothetical individual with the same high school education as Mayes and the same work history:

> I would initially like for you to assume that this individual could lift up to 20 pounds occasionally and 10 pounds frequently. This individual would be able to sit, stand or walk up to six hours each in an eight hour work day. This individual should never climb ladders, ropers or scaffolds, no more than occasionally climb ramps or stairs, no more than occasionally balance, stoop, kneel, crouch or crawl. This individual should no more than occasionally reach overhead with the left non-dominant upper extremity and this individual should avoid concentrated exposure to extreme cold which I'm going to define as less than 50 degrees Fahrenheit as well as unprotected heights and hazardous machinery. Given those limitations would such an individual be able to return to any of the claimant's past jobs?

AR 85-86. The VE responded in the negative. The VE identified three light unskilled jobs the hypothetical individual could perform including fastener, electronics assembler, and a labeler. The available sedentary jobs included circuit board assembler and finish assembler. The ALJ added to the hypothetical that the individual would be limited to lifting no more than 10 pounds and limited to no more than two hours of standing and walking in an eight hour work day. The VE explained that such additional limitations would eliminate the identified light unskilled jobs but that the sedentary jobs would remain. The ALJ further limited the hypothetical to the needed opportunity to alternate between sitting and standing, and if standing would need to be able to sit and if sitting, would need to be able to stand. Further, the ALJ explained that the individual would need to alternate at least one time every hour throughout the course of an eight hour work day and may remain in the alternated position up to five minutes though there may be tasks that the person could do so he would not necessarily lose production time. The VE responded that such further limitations would not affect the sedentary jobs he listed. The ALJ went a step further and explained that the frequency of alternation needed to happen once every 30

minutes, and the person would have to remain in the alternated position up to five minutes.

The VE responded that at that point the individual would have difficulty meeting productivity because there would be something to do when standing, but the identified jobs were typically sit down jobs so the individual would possibly be 10 minutes off task. If so, the individual would not be able to meet production. The ALJ next asked the VE to again assume the individual alternated positions every 30 minutes. The VE was asked to assume further that when alternating positions that frequently, the individual actually lost productivity and had to hang onto an assistive device while standing. The VE explained that if the individual was hanging onto an assistive device, then he would not be able to be productive and so would not be able to maintain production such that he would be unable to maintain employment. The ALJ summarized, "So if they're losing five minutes of productivity every 30 minutes they would be unable to maintain those jobs?" AR 88. The VE answered in the affirmative. The VE then clarified that the frequency of reaching, handling, and fingering requirements for the sedentary jobs was frequent. Finally, if the individual called in more than one day per month, that level of absenteeism precluded the identified jobs.

### III

In her Decision, the ALJ determined that Mayes had the following severe impairments: degenerative disc disease of the lumbar spine, mild arthritis of the left shoulder, and diabetes. The ALJ made the following residual functional capacity (RFC) finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR § 416.967(a) except no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, no climbing of ladders, ropes, or scaffolds, no more than occasional overhead reaching with the left non-dominant upper extremity, and no concentrated exposure to extreme cold (less

than 50 degrees Fahrenheit), unprotected heights, and hazardous machinery.

AR 28.

The ALJ discussed Mayes's hearing testimony at both hearings including his statements about the frequency of his pain, his efforts to relieve his pain, his use of a cane, his left leg weakness, his frequency of falling, his statements he could not raise his left shoulder overhead, his statements about how long he could sit at one time, his diabetic neuropathy, his typical day, his use of Fentanyl patches and Norco and their drowsiness side effect, the length of time he had to walk around to relieve back pain, the dose increase in his Fentanyl patch, his girlfriend's attempts to reduce his pain and her statements about the way he spent his days, and his pain doctor's communication that an MRI might not be picking up the pain of which he complained.

The ALJ referenced the multitude of Mayes's visits to the ER. The ALJ noted references to Mayes's possible drug-seeking behavior such as a November 9, 2011 ER visit during which he was moaning, asking for pain medication, and displaying very manipulative behavior. AR 746. During that visit he complained of left shoulder and upper back pain. Tests revealed left side upper back pain but no gait problem and a normal range of motion. The Initial Assessment/Plan notes from that day state:

> There is some serious question whether this is drug-seeking behavior vs any real pain. Patient's response seems altogether out of keeping with both his demeanor, ability to move, and physical findings. Here only several days ago and apparently then thought to be having similar issues.

AR 747. During his May 21, 2012 ER visit, a doctor noted an inconsistent examination during which Mayes would be moaning or calling out in pain at times but in between would be able to answer questions calmly and clearly. AR 918. During his August 29, 2012 ER visit, Mayes initially reported the worst headache of his life and upon seeing the doctor he no longer complained of a headache and instead reported lower

back pain radiating to his legs. During that same visit he was heard yelling and screaming and when a nurse asked him to try to keep his voice down, Mayes screamed, "I'll stop doing this if you give me Dilaudid."[4]  AR 1190. His headache improved with Norco and his back pain with pain medication.

During a September 1, 2012 visit to the ER, Mayes complained of intermittent left shoulder pain over the last three months. While he had been in the ER three days prior and was given Norco, he had not yet taken any of it. Mayes also represented that he fell from a chair in the triage area and had more pain in the shoulder, and when the nurse found him lying face down on the floor and his girlfriend standing next to him, she said Mayes just fell forward out of the wheelchair. Per a security video, as written in Mayes's ER notes from that date, Mayes actually lowered himself to the ground and placed himself prone on the floor but did not actually fall. AR 1006. The nurse further wrote in the notes, "Pt purposefully laid himself down for attention seeking behavior." AR 1006. A physical examination of Mayes revealed 5/5 strength with shoulder range of motion intact and a negative shoulder x-ray.

There was a post-it note on the Facesheet of Mayes's October 1, 2012 ER records which provided that there had been 27 one-day visits to the OSF[5] ER between June 3, 2011 and October 1, 2012. During an October 25, 2012 ER visit, the doctor noted that Mayes's diffuse pain was out of proportion to the physical exam findings. Mayes entered the ER complaining of abdominal pain on January 7, 2013. The doctor stated the abdominal pain could be related to alcohol vs. diabetic gastropathy vs. opioid withdrawal. When Mayes was back in the ER the next day, the doctor noted, "Pt appeared very uncomfortable on entrance to the room. After introduced [sic] myself as the doctor, pt laid quietly on stretcher supine for the exam. He did not exhibit any

---

[4] Dilaudid is the trademark for preparations of hydromorphone hydrochloride which is, in turn, "the hydrochloride salt of hydromorphone, having the same actions as the base; administered orally, subcutaneously, intramuscularly, intravenously, or rectally for the relief of moderate to severe pain, as an antitussive, and as an adjunct to anesthesia." DORLAND'S MEDICAL DICTIONARY, available at http://dorlands.com//def.jsp?id=100030052.
[5] OSF St. Francis Medical Center in Peoria, Illinois.

abdominal tenderness on exam."  AR 1974.  The doctor further wrote, "Avoiding narcs as pt has a h/o opioid dependence."  *Id*.  Again, Mayes returned to the ER the next day, January 9, 2013.   At that visit, the nurse noted that Mayes was hyperventilating, moaning, and rocking back and forth while his girlfriend was in the room.  When his girlfriend left the room and an IV was started, Mayes was somnolent, lying quietly, and in no apparent distress.  Upon his girlfriend's return to the room, Mayes began hyperventilating, moaning, and rocking back and forth again.  When seen by the doctor, there was no tenderness to palpation when Mayes was distracted and talking.

Also during his January 9, 2013 ER visit, Mayes requested pain medication and when offered Tylenol, he stated that it did not work and when the nurse returned to the room, Mayes was dressed and stated he was ready to go if he was not going to receive Dilaudid for his pain.  The nurse noted that Mayes and his "wife" (likely his girlfriend Barbara) were agitated and were told that narcotic medication was not best for constipation (of which Mayes complained).  The ALJ included discussion of notes from Mayes's January 10, 2013 ER visit during which he complained of shoulder and back spasms that began two days prior; the notes highlighted that Mayes represented his left shoulder pain was ongoing for three days even though he presented to the ER four days in a row of which three were for GI issues.  AR 2003.

The ER doctor noted that upon entering the room, Mayes was lying on his stomach comfortably, and after the doctor's arrival, Mayes sat up, leaned on both arms, and began moaning and rocking on the bed.  AR 2002.  When his left shoulder was examined, Mayes exhibited tenderness and pain but also exhibited normal range of motion and normal strength.  On his February 19, 2013 ER visit, Mayes voiced vague complaints on first questioning and provided several different reasons for his visit before "settling" on increased left leg weakness and a fall that morning.  AR 2153.  He was still able to sit up and stand without difficulty at that visit.  Following his May 3, 2013 visit, Mayes was observed to stand up from a wheelchair and walk in a stable

condition down the OSF parking lot to the bus stop, barely using his cane and grazing it intermittently along the ground as he walked. On July 22, 2013, Mayes was observed to jump off the stretcher and ambulate with a quick pace and steady gait to the bathroom. He carried his cane with him but did not use it. Other records of Mayes's ER visits during which he acted incongruously were included in the ALJ's Decision. The ALJ also tracked the various references to Mayes's constipation and the notes stating that narcotic medication made constipation worse.

The ALJ identified test results in the record, including: a February 28, 2012 lumbar spine MRI that revealed central broad-based disc bulge at L4-5 contributing to at least minimal bilateral lateral recess encroachment; a CT scan (prompted by a visit to the ER where Mayes complained of the worst headache of his life) that did not show any acute changes; x-rays on October 1, 2012 that indicated degenerative changes of the lumbar spine; left shoulder x-rays on October 27, 2012 that revealed mild narrowing of the left acromioclavicular joint; a lumbar spine MRI on January 14, 2013 that revealed degenerative disc at L4-5 which was unchanged from prior MRIs in February 2012 and October 2010; and three abdominal pelvic CT scans in 2012 that showed no acute abnormalities to explain his symptoms.

The ALJ also noted instances in the medical records where Mayes's medication compliance was unclear. During Mayes's February 6, 2012 ER visit, the doctor wrote, "I question whether he is actually complaint [sic] with his medications because although he tells me he takes his medications he can't really tell me what any of them are." AR 806. On August 6, 2012, an endocrinology note indicated Mayes's diabetes was uncontrolled due to lack of monitoring, following medication regimen, consistent carbohydrate meal plan, and coming to follow-up visits. AR 1302. During a diabetes education session on November 29, 2012, there was a question of how well he followed through with his diet and exercise regimen for diabetes.

The ALJ noted that on March 1, 2012, Mayes was prescribed a cane. He also attended twenty physical therapy sessions for his lumbar spinal stenosis between July

9, 2012 and October 10, 2012. During a physical therapy evaluation on August 22, 2012, Mayes stated he could not sit long due to tightness and said that activity helped relieve his pain. The ALJ otherwise noted the many instances in Mayes's medical records where he complained of back and left shoulder pain, where examinations indicated limited range of motion and his difficulty in moving, and where he was able to ambulate without difficulty and had full motor strength.

The ALJ also noted where the medical records indicated drug use, including: Mayes tested positive for cannabis during his August 29, 2012 ER visit though he denied drug use; he stated he drank alcohol three times a week during a January 7, 2013 ER visit; and he tested positive for cannabis during the January 7th visit.

Scattered throughout the ALJ's Decision were detailed summaries of Mayes's visits to his treating doctor, Dr. Stoner, and other medical appointments pertaining to his lower back pain and shoulder pain complaints. The ALJ also detailed Dr. Stoner's medical source statements from July 2012 and April 2013. The ALJ thereafter discussed the state agency consultants' assessments dated November 2012 and March 2013.

## IV

Mayes argues: 1) the ALJ erred in evaluating Mayes's subjective allegations under SSR 16-3p; 2) the ALJ erred because substantial evidence did not support the ALJ's finding that Mayes did not need a cane to walk or stand; and 3) the ALJ erred in evaluating Mayes's RFC when she rejected the medical opinions, creating an evidentiary deficit that she then improperly filled with her own lay opinion.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not

"merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 416.966 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 416.920. In the following order, the ALJ must evaluate whether the claimant:

1)      currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)      suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)      suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)      is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

> 5)   is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Mayes claims error on the ALJ's part at Step Four.

## A

Mayes argues that the ALJ failed to properly analyze the factors required under SSR 16-3p and, therefore, the ALJ failed to make a determination about what allegations were and were not credible and relied on meaningless boilerplate language for her analysis of Mayes's subjective complaints. The Commissioner counters that the ALJ's Decision made clear that in her view the overwhelming consideration in evaluating the evidentiary value of Mayes's statements and testimony was his track record of misleading his doctors about the nature and severity of his impairments.

Initially, the Court notes that the ALJ issued her Decision before the Social Security Administration issued Social Security Ruling 16-3p which supersedes SSR 98-7p. The new SSR directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms" rather than on "credibility." *Schuck v. Berryhill*, No. 16 C 5936, 2017 WL 2798390, at *5 (N.D. Ill. June 28, 2017), *quoting Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Because SSR 16-3p only clarifies the SSA's interpretation of existing law, that new ruling applies to Mayes's arguments in this case. *Schuck*, 2017

WL 2798390, at *5. SSR 16-3p still requires the ALJ to consider factors in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms including testimony, objective medical treatment, medication and its side effects, non-medication treatments, daily activities, and any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g. standing for 15 to 20 minutes every hour). *Id.*, *citing* SSR 16-3p, 2016 WL 1119029, at *4-7. Ultimately, "administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole*, 831 F.3d at 412 (emphasis in original).

Here, the Commissioner argues that it is difficult to articulate a compelling case that the ALJ's view in this regard was unreasonable. The Commissioner is correct. On the heels of her detailed discussion, among other things, of Mayes's voluminous medical records dated between November 2011 and May 2013, hearing testimony, his treating doctor's medical source statements, the various medications he was prescribed, and the various examinations and tests he underwent and the results of those examinations/tests, the ALJ summarized everything in the record before her in one paragraph. Mayes's own attorney (at the hearings) and the ALJ both explicitly acknowledged the curious case of Plaintiff Mayes. The ALJ stated in her Decision:

> As the claimant's attorney stated in his opening statements at the hearings, the claimant's case is somewhat puzzling. The claimant repeatedly and routinely goes to the emergency room with horrible pain complaints and while there he often acts very histrionic. His subjective allegations are often vastly disproportionate to the examination findings. On many occasions, the claimant admits that he has not taken any medication or tried anything to obtain relief from his pain (especially when it is abdominal pain complaints) and he at times reports engaging in behavior, such as alcohol consumption, and advised to abstain from alcohol. There are repeated concerns about drug-seeking behavior. However, radiographic imaging does confirm a degenerative spinal condition and early signs of arthritis in the left shoulder that could reasonably be causing the claimant pain. He also has poorly controlled diabetes (due mainly to poor compliance with his treatment regimen)

and has some neuropathy symptoms in the lower extremities. Moreover, at many of the ER visits, the claimant is noted to be diaphoretic (sweating) and is reporting vomiting (and at times vomiting during the visits). These constitutional signs would be somewhat difficult to fake, especially consistently, and do suggest that the claimant could be experiencing pain, especially when combined with elevated blood pressure and blood sugar (which could be caused by significant pain, but also by compliance issues). Yet, the sweating and vomiting would also be consistent with narcotic withdrawal, which is certainly a possibility considering the apparent inconsistent use of prescribed pain medications. The abdominal pain, especially the constipation-related discomfort, is likely related to the chronic use of narcotic medications. Interestingly, the claimant's histrionic behavior is more prevalent when his girlfriend is around, with several documented instances at the ER visits where the claimant was moaning, crying, rocking back and forth, or otherwise displaying signs of being in great pain when his girlfriend was present, but as soon as she left the room, he became calm and quiet and cooperative.

AR 21-22. Mayes contends that the ALJ failed to make a determination about what allegations were and were not credible. He avails himself of SSR 96-8p as further support for his argument that the ALJ's "credibility" analysis of his symptoms was erroneous. SSR 96-8p provides in relevant part that in all cases in which symptoms, such as pain, are alleged, the RFC assessment must contain a thorough discussion and analysis of objective medical and other evidence, include a resolution of any inconsistencies in the evidence as a whole, and set forth a logical explanation of the effects of the symptoms on the individual's ability to work. The ALJ made no reversible error in this regard. The entirety of the paragraph *supra* makes clear that the ALJ *did* consider which allegations were credible and which ones were not, and she did so without even a phrase of boilerplate language (contrary to Mayes's arguments) and even with all the contradictions that Mayes's medical records and his own complaints presented.

While Mayes points to the ALJ's alleged discrete failure to discuss the side effects of his medications and his use of mostly unsuccessful alternative methods for

pain relief, he loses sight of the fact that the ALJ was busy sifting through the *substantial evidence* of drug-seeking behavior, histrionics, and evidence indicative of exaggerated symptoms and outright lies to determine the extent to which Mayes even needed all of the medication he took and treatments he tried. The Court can easily trace the path of the ALJ's reasoning in her analysis of the intensity, persistence, and limiting effects of Mayes's symptoms and the resulting extent to which they limited his functioning. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").

## B

Mayes next argues that the ALJ failed to discuss or adequately support with substantial evidence her determination that Mayes did not require the use of a cane to stand or walk. The Commissioner argues that the ALJ provided a cogent analysis of why she discredited Mayes's allegations that he needed a cane.

Mayes specifically argues that the ALJ applied the wrong legal standard in evaluating his cane use where the ALJ said the medical evidence "fail[ed] to clearly demonstrate that use of a cane is medically necessary" because the actual standard is a "preponderance of the evidence." The Commissioner argues Mayes is playing word games because at no point did the ALJ say that she was applying a "clear and convincing" standard. Indeed, Mayes's argument falls short when the ALJ's discussion regarding Mayes's cane use is considered as a whole. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that a court will give an ALJ's opinion a commonsensical reading rather than nitpicking at it). The ALJ identified instances in the medical records where Mayes was noted to be using a cane, where he reported falls, where medical personnel responded accordingly to information that Mayes was a fall risk, and where Mayes stated he used a cane. The ALJ also articulated the examination findings and test results both indicating Mayes's spinal issues and

supporting his assertions that his left leg often felt weak. It is certain from her discussion of the evidence that the ALJ properly and sufficiently supported her determination that Mayes's use of a cane was not medically necessary. Nevertheless, the ALJ should exercise caution in using language in her decisions that may expose those decisions to the argument like the one Mayes makes here.

Mayes also continually emphasizes that his physical therapist prescribed him a cane in March 2012 as further support for his argument that the ALJ failed to adequately support her determination that Mayes required the use of a cane to stand or walk. He makes much ado about little. In her Decision, the ALJ included the fact that Mayes was prescribed a cane on March 1, 2012, and that was only one line of many dedicated to record evidence pertaining to Mayes's cane use.[6] While Mayes argues that the ALJ failed to analyze his physical therapist's opinions under the factors listed in 20 C.F.R. § 416.927 and SSR 06-3p, he does not point to any particular "opinions" in the record or otherwise articulate what those "opinions" were. Mayes does not argue how the 20 pages of physical therapy notes to which he points are "opinions" that his use of a cane is necessary for him to stand or walk; in fact, he does not even name his physical therapist who allegedly provided opinions on his need for a cane. Merely citing a span of medical records in support of a conclusory assertion that an ALJ failed to apply the relevant factors to a medical source's opinions when analyzing those opinions is insufficient to warrant a remand.

Mayes further argues the ALJ's determination regarding his cane was erroneous because the ALJ did not properly analyze his treating doctor's, Dr. Stoner's, opinion under § 416.927 specifically with regard to the cane. Where an ALJ does not give controlling weight to a treating physician's opinion, the ALJ still must decide

_____

[6] As an aside, the evidence to which Mayes points includes: a "Sales, Service, and Rental Agreement" form indicating a cane was delivered to Mayes on March 1, 2012 signed by Mayes and a Technician; a Discharge Summary dated March 2, 2012 that provided "Physical Therapy evaluated this patient during this admission and recommended the use of a cane. A cane was ordered and will be delivered by Home Health;" and notes from Mayes's physical therapy sessions.

what weight to give that opinion.  *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).

The applicable regulations identify several factors an ALJ must consider including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion.  *Id*.

Here, the ALJ included a detailed explanation for why she determined that Dr. Stoner's opinion that Mayes needed a cane was not sufficiently supported by the record evidence.  The ALJ explained:

> Dr. Stoner opined that the claimant needed a cane for occasional standing or walking, but the medical evidence, including Dr. Stoner's own treatment notes, fail to clearly demonstrate that use of a cane is medically necessary.  There have been multiple instances where he was using the cane improperly.  At an ER visit in May 2013, the claimant was told that he was not going to receive narcotics.  He was observed to stand up from a wheelchair and walk in a stable condition down the parking lot to the bus stop, barely using the cane, grazing it intermittently along the ground as he walked.  One of the main reasons reported for the alleged need of a cane is frequent falls.  However, there is no credible evidence that the claimant's legs actually give out on him and cause him to fall or almost fall.  The ER records indicate multiple instances where the claimant appears to have pretended to fall.

AR 44.  The above explanation together with other parts of the ALJ's Decision foreclose Mayes's contention that the ALJ did not consider the relevant factors when she decided to give Dr. Stoner's opinion minimal weight.  The ALJ clearly did consider the nature and extent of Dr. Stoner's treatment relationship with Mayes and the supportability of his opinion.  Throughout her Decision, the ALJ recited Mayes's visits with Dr. Stoner and the subjective complaints Mayes made to him and examinations done of Mayes during those visits.

The ALJ pointed out that:  during the December 18, 2012 visit with Dr. Stoner, an examination "revealed restricted spinal range of motion, but normal neurologic functioning;" during the March 5, 2013 visit with Dr. Stoner, Mayes had "no palpable

tenderness in the lumbar spine, but there was moderately reduced range of motion;" and during the April 11, 2013 visit, Mayes had "difficulty getting out of a chair and he walked as though he had severe pain in the left leg."  AR 33, 35, 36.  The February 4, 2014 visit with Dr. Stoner was "one of the rare occasions where [his] treatment notes actually indicate a spinal examination took place."  AR 40.  Given these and other instances in the ALJ's Decision, the Court is assured that the ALJ considered the important evidence before reaching her conclusion that Dr. Stoner's opinion was to be given only minimal weight.  *See Carlson*, 999 F.2d at 181; *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013) (explaining that the ALJ's failure to explicitly weigh each factor under 20 C.F.R. § 404.1527 was not a problem where his decision made clear that he was aware of and considered many of the factors).[7]

Lastly, it is apparent from the ALJ's explanation above that she reached her conclusion about the weight to give Dr. Stoner's opinion in light of the plentiful record evidence that Mayes's assertions about the intensity, persistence, and limiting effects of his physical impairments fell far short of "credible."  As discussed previously, the ALJ did not err in her analysis of the factors under SSR 16-3p.  The Court cannot fault the ALJ for finding as she did, particularly where she did so within the bounds of the legal framework she was required to decide Mayes's application for SSI.  In fact, had the ALJ completely disregarded evidence of Mayes's observed contradictions in behavior, use of his cane, and histrionics, the ALJ would have run afoul of her obligation to discuss lines of evidence both favorable and unfavorable to her decision. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (stating that it was worth repeating that an ALJ may not ignore an entire line of evidence that is contrary to his findings).

## C

---

[7] The factors listed under 20 C.F.R. § 404.1527(c) for DIB are the same factors as those listed under 20 C.F.R. § 416.927(c) for SSI.

Mayes's third argument is that the ALJ created an evidentiary deficit when she afforded only "some" or "little" weight to all of the medical opinions of record, and then assessed Mayes's RFC based on her own lay opinion instead of basing the finding on evidence. He asserts that it is not clear what evidence the ALJ relied upon to determine his RFC and that the ALJ impermissibly adopted a "middle ground" without support for it. The Commissioner argues, first, that the ALJ gave cogent reasons for her decision to discount Dr. Stoner's opinions, and second, Mayes incorrectly asserts that an ALJ's opinion must line up with one of the medical opinions of record.

Pursuant to SSR 96-8p, an RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005), *citing* SSR 96-8p at *7. While Mayes focuses his arguments on the ALJ's alleged failure to comply with SSR 96-8p, the Commissioner focuses her counter-argument on the ALJ's alleged proper weighing of Mayes's treating doctor's opinions. The Court already addressed the weight given to Dr. Stoner's opinion, specifically with regard to Mayes's use of a cane, and explained why the ALJ did not err on that particular issue. The Court further finds that the ALJ's consideration of Dr. Stoner's opinions on the whole was also not erroneous.

In her Decision, the ALJ detailed Dr. Stoner's July 31, 2012 Physical Medical Source Statement in which he stated Mayes's prognosis was "good." AR 41. The Statement also provided that Mayes had a positive straight leg raise test on the left, Mayes had fair pain control with his various medications, he could walk less than a block before stopping to rest, he could sit for 15 minutes at one time and stand for 10-15 minutes at one time, he could sit for two hours and stand or walk for less than two hours in an eight-hour workday, he needed periods of walking around every 15 minutes during the workday, and his breaks were necessitated by pain and numbness. *Id*. Dr. Stoner also stated that Mayes had no significant limitations in

manipulative activities with the upper extremities. *Id*. Dr. Stoner opined that Mayes's symptoms would be severe enough to interfere with attention and concentration needed to perform even simple work tasks 25% of the time or more. *Id*. The ALJ also recited Dr. Stoner's medical records from Mayes's visit the day before that Statement was written. In those records, Mayes reported his pain level as 4/10 and the physical examination notes did not document any specific evaluation of the lumbar spine. *Id*.

The ALJ also detailed Dr. Stoner's April 11, 2013 Medical Source Statement of Ability to do Work-Related Activities (Physical). Dr. Stoner stated Mayes could both occasionally and frequently lift and carry less than ten pounds due to chronic left chest pain, could walk less than two hours in an eight-hour workday (and needed a cane because his left leg became weaker after an hour and a half on his feet), could sit for less than six hours in an eight hour workday, and could sit for three hours without having to get up and move. AR 42. Dr. Stoner also stated that Mayes was unable to reach overhead with the left upper extremity and that reaching in general should be limited to occasionally, but that handling, fingering and feeling were unlimited. *Id*.

> After detailing Dr. Stoner's July 2012 and April 2013 Statements, the ALJ stated:
>
> The medical records do not reflect a significant difference in the claimant's functioning between July 2012 and April 2013. Therefore, even though the format of the medical source statements completed by Dr. Stoner was different, the answers to the same or similar questions on both forms ought to be fairly consistent . . . However, there are some vastly different answers with no explanations on either the medical source statements or in Dr. Stoner's treatment notes to explain the differences in opinion.

AR 42. The ALJ proceeded to discuss those "vastly different" answers and also pointed to Mayes's first hearing testimony where he said he could sit for an hour and a half at a time and his second hearing testimony where he said he could sit for only 10 minutes before needing to get up and move around due to muscle spasms. Later in that second hearing, Mayes testified that he could sit for about 45 minutes before back tightness required him to get up and move around. The ALJ commented, "The

claimant, himself, has not been consistent in his own statements, but his range of estimated times shows less discrepancy than Dr. Stoner."

The ALJ continued:

> The more basic flaw in both assessments is that the opinions of Dr. Stoner rely very heavily on the subjective allegations of the claimant, who has a demonstrated pattern of histrionic behavior allegation symptoms, especially pain, that are repeated noted to be out of proportion to the examination findings. The July 2012 assessment contains no rationale or explanation linking the specific alleged limitations to the objective medical evidence (or even the claimant's allegations of his own limitations). The April 2013 assessment does contain explanations/rationales for some of the specific limitations, but these explanations still rely heavily on subjective allegations that are not well-supported by the medical evidence of record, in particular Dr. Stoner's own treatment notes. The claimant's most significant impairment is arguably the degenerative spinal condition with radiation of pain and other symptoms of the legs. However, the records from Dr. Stoner rarely ever document examination of the spine or lower extremities, giving Dr. Stoner little insight into how the claimant's allegations correspond to objective clinical findings and giving Dr. Stoner little direct knowledge of physical functioning. Dr. Stoner stated that some of the specified limitations were due to weakness in the legs, but examinations have consistently demonstrated normal motor strength and tone in the lower extremities. There is no evidence of muscle atrophy in the legs or other signs that might demonstrate persistent weakness.

AR 43-44.

The ALJ laid out the state agency medical consultant's November 30, 2012 physical residual functional capacity assessment which was affirmed by another state agency medical consultant on March 6, 2013 in which the former consultant opined that Mayes could lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand or walk for about six hours in an eight hour workday, sit for two hours, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, never climb ladders, ropes, or scaffolds, and needed to avoid concentrated exposure to extreme cold and environmental hazards. AR 44.

The ALJ found that while the state agency consultants' non-exertional limitations were reasonable, she found greater exertional restrictions warranted. She noted that Mayes's left shoulder complaints were somewhat intermittent and examination findings somewhat inconsistent though there was evidence of mild arthritis of the left shoulder; accordingly, she determined that the objective medical evidence failed to substantiate complete inability to lift the left arm overhead but that it would be reasonable to restrict overhead reaching with the left upper extremity to only occasionally. The ALJ referred to the frequent discrepancies between Mayes's allegations and objective clinical findings, documented evidence of a fake "fall," repeated histrionic behavior, and inconsistent compliance with treatment regimen as support for her finding that Mayes's own allegations about extreme exertional limitations were not credible while also finding the state agency consultants' assessments overstated Mayes's physical abilities.

As for her finding that there was "no compelling evidence that the claimant could not sit for up to six hours in an eight hour workday," the ALJ considered that periods of standing and walking would be mixed in throughout the workday and Mayes would have the standard work breaks during which he could alternate positions as he chose. AR 46. Mayes argues that the ALJ effectively rejected the state agency consultants' opinions that he could stand/walk for six hours in an eight hour workday and sit for two hours in that eight hour day (among other things), resulting in the ALJ's finding in this regard entirely unsupported and the gap filled in with her own lay opinion. Perhaps the ALJ did not point to a piece of evidence in the record which expressly provided that Mayes could sit for up to six hours in an eight hour workday, but the ALJ *did* discuss, at length, the medical evidence which indicated an actual impairment capable of causing limitation and the plentiful evidence which detracted from the alleged extent of the limitation and which detracted from the opinions in support of greater limitation than the ALJ found. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) ("an ALJ must build an accurate and logical bridge from

the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence"). Of course, an ALJ has the ultimate responsibility of assessing a claimant's RFC. 20 C.F.R. § 416.945(a)(1).

In light of all the above excerpts and the ALJ's Decision considered as a whole, the Court can easily trace the path of the ALJ's reasoning in reaching the RFC finding that she did in a case that essentially presented a claimant who was a moving target. Her narrative discussion of the record evidence sufficiently described how the evidence supported her conclusions. She identified key parts of the records, both medical and otherwise, which supported her conclusions and those that detracted from it and how she reconciled the latter with her ultimate findings. The ALJ's "middle ground" RFC finding was therefore well-supported, and simply, the ALJ presented substantial evidence to support her RFC assessment. Thus, the ALJ did not run afoul of either SSR 96-8p or 416.927.

## V

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 14) is DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 18) is GRANTED. This matter is now terminated.

*It is so ordered.*

Entered on September 26, 2017.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE